**SEALED**

**SEALED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. *17-60243-YK-Bloom/Valle*

18 U.S.C. § 1035(a)(2)
18 U.S.C. § 1349
18 U.S.C. § 1956(h)
18 U.S.C. § 1962(d)
18 U.S.C. § 2

**UNITED STATES OF AMERICA**

v.

**FELIX FILENGER,
ANDREW RUBINSTEIN,
a/k/a Andrei Rubinsteyn, and
OLGA SPIVAK,**

> FILED BY _____ D.C.
>
> OCT - 3 2017
>
> STEVEN M. LARIMORE
> CLERK U.S. DIST. CT.
> S.D. OF FLA. FT. LAUD.

                                    **Defendants.**

_____/

### INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

#### Florida's Motor Vehicle No-Fault Law

1.      Florida was a "no-fault" insurance state, which required every driver to maintain automobile insurance. The Florida Motor Vehicle No-Fault Law ("Florida's No-Fault Law"), Fla. Stat. §§ 627.730-627.7405, requires all drivers to maintain insurance. Under Florida's No-Fault Law, persons who were injured had recourse to medical, surgical, funeral, and disability insurance benefits without regard to fault. With respect to motor vehicle accidents, a limitation was imposed on the right to claim damages for pain, suffering, mental anguish, and inconvenience. The required

1

insurance had to include personal injury protection ("PIP") to the named insured, relatives residing in the same household, persons operating the insured motor vehicle, passengers in the motor vehicle, and other persons struck by the motor vehicle who suffered bodily injury while not occupants of a self-propelled vehicle to a limit of $10,000 for each such person as a result of bodily injury, sickness, disease, or death. Fla. Stat. § 627.736 (1).

2.      Under Florida's No-Fault Law, the insurance provider was required to pay PIP benefits of up to $10,000 each for accidental bodily injury sustained by the vehicle owner and all occupants of the vehicle due to an accident within the State of Florida. Fla. Stat. § 627.736(4)(e). Up to the $10,000 limit, the insurance provider was required to pay eighty percent of all reasonable expenses for medically necessary medical, surgical, x-ray, dental, and rehabilitative services . . . that are lawfully provided, supervised, ordered, or prescribed by a licensed physician, licensed dentist, or licensed chiropractic physician, or that are provided by certain other approved providers, including entities wholly-owned by licensed chiropractic physicians. Fla. Stat. § 627.736(1)(a).

3.      On January 1, 2013, Florida's No-Fault Law changed. Under the revised statute, reimbursement for services was permitted up to $10,000, if a licensed medical professional determined that the accident victim had an Emergency Medical Condition (hereinafter referred to as an "EMC"), that is, the accident caused severe pain that jeopardized the patient's health or impaired the patient's bodily functions. If a licensed medical professional did not determine that the injured person had an EMC, the reimbursement for services was limited to $2,500. Emergency medical condition means a medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: serious jeopardy to patient health, serious impairment to bodily functions, and serious dysfunction of any bodily organ or part.

2

4.      Florida's No-Fault Law provided that an insurer or insured is not required to pay a claim or charges . . . for any service or treatment that was not lawful at the time rendered.  Fla. Stat. § 627.736(5)(b)(1)(b). The term "lawful" was defined in the statute as "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." Fla. Stat. § 627.732(11).

5.      Florida's No-Fault Law further provided that "a statement of medical services may not include charges for medical services of a person or entity that performed such services without possessing the valid licenses required to perform such services." Fla. Stat. § 627.736(5)(d).

6.      An insurer also was not required to pay a claim or charges to "any person who knowingly submits a false or misleading statement relating to the claim or charges." Fla. Stat. § 627.736(5)(b)(1)(c).

7.      Florida's No-Fault Law required that an insured person, or his or her guardian, execute a disclosure and acknowledgment form, the Florida Office of Insurance Regulation Standard Disclosure and Acknowledgement Form, which reflected that the insured, or his or her guardian, was not solicited by anyone person to seek services from the medical. Fla. Stat. § 627.736(5)(e)(1).  The licensed medical professional rendering treatment for which payment was being claimed was required to sign, by his or her own hand, the required form. Fla. Stat. § 627.736(e)(4).

### Clinic Licensing Requirements

8.      In 2003, the Florida Legislature enacted the Health Care Clinic Act ("HCCA"), Fla. Stat. §§ 400.990, et seq., to strengthen the regulation of health care clinics throughout Florida.  In addition to expanding the types of businesses required to obtain licenses, the HCCA required, among other things, background checks for all owners which have a 5% or more ownership

interest, clinic inspections and certifications, proof of financial responsibility, and, in some cases, higher fees to obtain licensure. These requirements were administered by the Florida Agency for Health Care Administration.   The HCCA contained a number of exceptions to its licensure requirements, one of which was that a license was not required for a business that "provided health care services by licensed health care practitioners [including chiropractors], . . . and that is wholly owned by one or more licensed health care practitioners . . ." Fla. Stat. § 400.9905(4)(g).

9.     Under the HCCA, "it is unlawful to provide services that require licensure . . . without first obtaining . . . a license." Fla. Stat. § 408.804.  It also was unlawful for an entity to offer services that required licensure without obtaining a valid license from the Florida Agency for Health Care Administration. Fla. Stat. § 408.812(1). The HCCA also made it "unlawful for any person or entity to own, operate, or maintain an unlicensed provider.  Fla. Stat. § 408.812(3).

### Florida's Prohibitions on Insurance Fraud, Kickbacks. and Patient Brokering

10.     Under Florida law, a person committed insurance fraud if that person, with the intent to injure, defraud, or deceive any insurer: (1) knowingly presented or caused to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contained any false, incomplete, or misleading information concerning any fact or thing material to the claim; or (2) knowingly prepared or made any written or oral statement that is intended to be presented to any insurer in connection with, or in support of, any claim for payment or other benefit pursuant to an insurance policy, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to the claim.  Fla. Stat. § 817.234(1)(a)1 & 2.

11.     Florida law also stated that it "shall constitute a material omission and insurance fraud . . . for any service provider, other than a hospital, to engage in a general business practice

4

of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge." Fla. Stat. § 817.234(7)(a).

12.     Florida law also prohibited offering to pay, paying, soliciting, or receiving any commission, bonus, rebate, kickback, or bribe, directly or indirectly, to induce the referral of patients to a health care provider or facility or in return for referring patients to a health care provider or facility, or for accepting or acknowledging receipt of treatment from a health care provider or facility. Fla. Stat. §§ 817.505(1), 456.054(2).

### Florida Law Regarding Solicitation and Written Reports of Automobile Crashes
### Florida Statute 316.066

13.     Fla. Stat. § 316.066 directed that automobile accident crash reports that reveal the identity, home or employment telephone number or home or employment address of, or other personal information concerning the parties involved in the crash are confidential and exempt from disclosure for a period of 60 days after the date the report is filed, with certain exceptions.

### The Clinics

14.     The following clinics (hereinafter the clinics set forth in this paragraph will collectively be referred to as "The Clinics") were owned and operated by defendants **Felix Filenger** (hereinafter referred to as "**Filenger**") and **Andrew Rubinstein** (hereinafter referred to as "**Rubinstein**") through the use of co-conspirator nominees:

A.     Advance Medical Associates and Forme Rehab, Inc. (hereinafter referred to as "Advance Medical") located at 7000 W. Oakland Park Boulevard, Suite 202, Sunrise, Florida 33313.  From in or about 2008 through in or about 2010, Advance Medical was owned by a co-conspirator (hereinafter referred to as "Co-conspirator 1");

B.     Hollywood Wellness and Rehabilitation Center, Inc. (hereinafter "Hollywood Wellness") located at 6030 Hollywood Boulevard, Hollywood, Florida;

C.     Accumed Wellness and Rehabilitation Center, Inc. (hereinafter referred to as "Accumed Wellness") located at 290 NW 165th Street, Miami, Florida;

D.     Medwell Wellness and Rehabilitation Center, Inc. (hereinafter referred to as "Medwell Wellness") located at 2250 Palm Beach Lakes Blvd. West Palm Beach, Florida;

E.     West Coast Chiropractic and Rehabilitation Center P.A. (hereinafter referred to as "West Coast Chiropractic");

F.     Total Wellness Chiropractic Center, Inc. (hereinafter referred to as "Total Wellness") located at 1009 N. Dixie Highway, Hallandale Beach, Florida;

G.     Total Rehabilitation & Wellness Center P.A. (hereinafter referred to as "Total Rehab");

H.     Osceola Chiropractic & Wellness Center, P.A. (hereinafter referred to as "Osceola Chiropractic") located at 1065 N. John Young Parkway, Kissimmee, Florida;

I.     Metro Chiropractic & Wellness, P.A. (hereinafter referred to as "Metro Chiropractic") located at 5979 Vineland Rd. Orlando, Florida;

J.     West Palm Beach Wellness & Rehabilitation Center P.A. (hereinafter referred to as "West Palm Beach Wellness") located at 2695 N. Military Trail, West Palm Beach, Florida;

K.     Central Florida Wellness and Rehabilitation, P.A. (Central Florida Wellness);

L.     Global Wellness and Rehabilitation, Inc. (hereinafter referred to as "Global Wellness") located at 601 East Sample Road, Pompano Beach, Florida;

6

M.      Delray Chiropractic and Wellness Center, Inc. (hereinafter referred to as "Delray Chiropractic") located at 1200 NW 17th Avenue, Suite 7, Delray Beach, Florida 33445;

N.      Palm Beach Chiropractic and Wellness Center, Inc. (hereinafter referred to as "Palm Beach Chiropractic") located at 2695 N. Military Trail, Suite 2, West Palm Beach, Florida 33409; and

O.      Other clinics operating in the State of Florida, including a clinic located in Kendall in Miami-Dade County.

15.     Co-conspirator 1 was a chiropractor who was utilized by defendants **Filenger** and **Rubinstein** to act as the nominee owner for Advance Medical and Hollywood Wellness.

16.     Defendant **Olga Spivak** (hereinafter referred to as "**Spivak**") was a chiropractor who was utilized by defendants **Filenger** and **Rubinstein** to act as the nominee owner for Accumed Wellness, Medwell Wellness, West Coast Chiropractic, and Total Wellness.

17.     A co-conspirator (hereinafter referred to as "Co-conspirator 2") was a chiropractor who was utilized by defendants **Filenger** and **Rubinstein** to act as the nominee owner for Osceola Chiropractic and Metro Chiropractic.

18.     A co-conspirator (hereinafter referred to as "Co-conspirator 3") was a chiropractor who was utilized by defendants **Filenger** and **Rubinstein** to act as the nominee owner for Total Rehab, West Palm Beach Wellness, and Central Florida Wellness.  Co-conspirator 3 was utilized by defendants **Filenger** and **Rubinstein** to act as the nominee owner for Osceola Chiropractic and Metro after Co-conspirator 2 left.

19.     A co-conspirator (hereinafter referred to as "Co-conspirator 4") was a chiropractor who was utilized by defendants **Filenger** and **Rubinstein** to act as the nominee owner for Global Wellness.

### The Insurance Companies and the Bank

20.     The Clinics would submit PIP claims and other related documents by United States mail to insurance companies. (hereinafter collectively referred to as the "Insurance Companies").

21.     The Insurance Companies periodically issued a form to some of The Clinics authored by the Florida Office of Insurance Regulation entitled Health Care Provider Certification of Eligibility for PIP benefits (hereinafter referred to as "Form 6b"), which form required the true owner to complete the form and sign it certifying that the person signing was the true owner.

22.     The Insurance Companies periodically requested information from The Clinics and performed Examinations Under Oath of patients and others in order to determine the validity of a claim.

23.     Bank of America, N.A., Citibank, N. A., and JPMorgan Chase & Co. (hereinafter collectively referred to as "The Banks") were domestic financial institutions with branches located in Broward, Miami-Dade, and Palm Beach Counties in the Southern District of Florida.  Payments from the Insurance Companies were sent by U.S. mail to The Clinics and subsequently deposited into an account at one of The Banks, and were thereby transmitted in interstate commerce.

### COUNT ONE
### Conspiracy to Commit Racketeering Activity
### (18 U.S.C. § 1962(d))

1.     The General Allegations section is hereby realleged and incorporated as if fully set forth herein.

### The Enterprise

2.     Beginning at least in or about 2010 and continuing through the present, in Broward, Miami-Dade, and Palm Beach Counties, in the Southern District of Florida and elsewhere, the defendants, **Felix Filenger**, **Andrew Rubinstein**, and **Olga Spivak** and the entities, Advance

Medical, Hollywood Wellness, Accumed Wellness, Medwell Wellness, West Coast Chiropractic, Total Wellness, Total Rehab, Osceola Chiropractic, Metro Chiropractic, West Palm Beach Wellness, Central Florida Wellness, Global Wellness, Delray Chiropractic, Palm Beach Chiropractic and other clinics operating in the State of Florida, including a clinic located in Kendall in Miami-Dade County (collectively known as "The Clinics") and others known and unknown to the Grand Jury, constituted an Enterprise within the meaning of Title 18, United States Code, Section 1961(4), that is, a group of individuals and entities associated in fact. The Enterprise constituted an ongoing organization, the members and associates of which functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

## The Conspiracy

3.      Beginning at least in or about 2010 and continuing thereafter through the present, in Broward, Miami-Dade and Palm Beach counties in the Southern District of Florida and elsewhere, the defendants,

**FELIX FILENGER,**
**ANDREW RUBINSTEIN and,**
**OLGA SPIVAK,**

being persons employed by and associated with the Enterprise, which Enterprise engaged in, and the activities of which affected interstate and foreign commerce, did knowingly, willfully and unlawfully combine, conspire, confederate and agree, with each other and with persons known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise, through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and (5) as set forth below at paragraph 4.

## The Pattern of Racketeering Activity

4.      The pattern of racketeering activity, as defined in Title 18, Unites States Code, Sections 1961(1) and (5), through which the defendants and their co-conspirators agreed to conduct and participate in the conduct of the affairs of the Enterprise consisted of multiple acts indictable under:

A       Title 18, United States Code, Section 1341 (Mail Fraud);

B.      Title 18, United States Code, Section 1343 (Wire Fraud);

C.      Title 18, United States Code, Section 1956 (Money Laundering);

D.      Title 18, United States Code, Section 1956(h) (Conspiring to commit Money Laundering); and

E.      Title 18, United States Code, Section 1957 (Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity).

It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

## Goals and Background of the Enterprise

5.      The goal of the criminal Enterprise was to defraud automobile insurance providers by obtaining the maximum amount of PIP funds through: (1) the establishment and operation of chiropractic clinics/rehab facilities; (2) the use of nominees; (3) the illegal solicitation of patients; (4) the fraudulent submission of documents reflecting facility ownership; (5) the billing for unnecessary and/or inflated treatment modalities, regardless of medical necessity; and (6) the misrepresentation of patient injury and pain levels; and to launder the criminal proceeds derived from the Enterprise activity, among other criminal activities as further described below.

6.      Defendants **Filenger** and **Rubinstein** facilitated the submission of claim forms for PIP reimbursement for patients who were illegally solicited and whose treatment was rendered as a result of illegal kickback payments to co-conspirator runners and corrupt attorneys.

7.      Defendants **Filenger** and **Rubinstein** operated, managed, and supervised a criminal Enterprise which utilized co-conspirator chiropractors, including defendant **Spivak**, therapists, "runners," corrupt attorneys and other co-conspirators to illegally obtain the maximum amount of automobile insurance proceeds (PIP) through acts of fraud and deceit.

8.      Defendants **Filenger** and **Rubinstein** unlawfully utilized nominees, including co-conspirator chiropractors, to fraudulently place the chiropractor's names on documents submitted to the State of Florida and insurance companies. The clinics utilized "runners" to illegally solicit patients to the health care clinics. These "runners," including tow truck drivers, and others, attempted to steer auto accident victims/patients to specific rehab clinics or attorneys. The runners were generally paid amounts ranging from $500-$2,500 per patient by the co-conspirator clinic owners or corrupt attorneys. At times, the "runners" would orchestrate staged auto accidents in order to defraud insurance companies. In addition, co-conspirator corrupt lawyers illegally referred clients to co-conspirator rehab clinics and were paid approximately $2,000 per patient by defendants **Filenger** and **Rubinstein**.  The co-conspirators agreed that, regardless of medical necessity, the patients should receive treatment at the medical clinics for a specific number of visits and for unnecessary or inflated treatment modalities in order that the co-conspirators could obtain the maximum payment under the patient's auto insurance policy (PIP), and so that the co-conspirator corrupt attorneys could attempt to obtain greater settlements from the insurance companies for the ensuing bodily injury lawsuits.

## Roles of Co-Conspirators - Concealed Clinic Owners

9.     Defendants **Filenger** and **Rubinstein** unlawfully utilized nominee chiropractors, including defendant **Spivak** and Co-conspirators 1, 2, 3, and 4, who were licensed health care practitioners, to register their names with the State of Florida as the owners of medical clinics to conceal the true ownership interests of the defendants.  Defendants **Filenger** and **Rubinstein** failed to apply to the Florida Agency for Health Care Administration for licenses for their clinics in order to avoid the required background checks, clinic inspections and proof of financial responsibility, as required under applicable Florida state law.  Defendants **Filenger** and **Rubinstein** also failed to apply to the Florida Agency for Health Care Administration for licenses for their clinics in order to ensure payment by the insurance companies, and to otherwise facilitate the operation of their criminal enterprise.

10.     Defendants **Filenger** and **Rubinstein** supervised the criminal enterprise and made decisions regarding the operation of the chiropractic clinics/rehab facilities, the manner and means of the fraudulent activity, and the disposition of the funds generated through the Enterprise's criminal activities. They formulated and gave instructions to co-conspirator chiropractors, therapists, and other medical professions regarding the interaction with patients and the objective to maximize the receipt of PIP funds through fraud. They made and directed payments and/or collected funds to and from runners and corrupt attorneys. They controlled the receipt of insurance reimbursement funds and used such funds to finance and operate the criminal enterprise and to enrich themselves and the conspirators. They controlled the hiring and firing of clinic personnel. They established the clinic protocol regarding the number of office visits required for each patient and the treatment modalities received by the patients, including the use of expensive medical

treatments. All such activity was intended to maximize the insurance reimbursements and not for medical necessity.

## Runners

11.      Defendants **Filenger** and **Rubinstein** conspired with runners.  The term "runner" is meant to describe individuals who participated in the illegal solicitation of individuals involved in automobile accidents and the referral of such individuals to clinics, rehab facilities, and attorneys. Said runners received illegal kickbacks from corrupt clinic/rehab owners and corrupt attorneys as compensation for the referral of such individuals.  The runners illegally solicited patients to received treatment at the Enterprise's facilities for financial compensation and in contravention of Florida law.  The runners, including tow truck drivers, and persons involved in the criminal business of illegal solicitation of patients, attempted to steer automobile accident victims/patients to co-conspirator chiropractic/rehab clinics and corrupt attorneys. Generally, the runners were paid amounts ranging from $500-$2,500 per patient by the Enterprise's members and co-conspirators including illegal clinic owners and corrupt attorneys. At times, the runners would "trade" illegally solicited patients among and between clinics and attorneys in order to generate criminal profits. The runners would attempt to meet with auto accident victims, as soon as possible after the accident, in order to unlawfully solicit such individuals.

12.      The runners were often paid in cash or through nominee corporate entities.  The runners also used the nominee corporate entities to conceal their criminal activities.  The nominee corporate entities falsely claimed to be members of the "media" in order to illegally claim a statutory exception to the 60-day prohibition of disclosure of police reports and enable the runners to obtain the reports as quickly as possible.

13.     The runners advised and instructed the patients to visit the co-conspirator clinics and receive treatments for a requisite number of times, in order to ensure the recovery of the full PIP reimbursement, regardless of medical necessity. The runners instructed the patients to falsely state that they had not been solicited for treatment. The runners instructed the patients to falsely claim high pain levels in order to facilitate the fraud and to justify the determination that an EMC existed.

<b><u>Attorneys</u></b>

14.     The co-conspirators included corrupt attorneys who referred clients to co-conspirators clinics/rehab facilities in return for illegal compensation paid by the co-conspirator owners of such facilities. The co-conspirator corrupt attorneys misled patients through fraudulent statements into believing that such patients had viable and potentially lucrative law suits in order to entice such patients into receiving numerous treatments at the co-conspirator facilities and to visit the facilities numerous times. The co-conspirator corrupt attorneys employed in-house runners, disguised as law firm investigators and/or independent contractors in order to illegally solicit clients/patients. Independent runners would, at times, refer accident victims to corrupt attorneys in order to illegally solicit potential lawsuits and to encourage the patients to receive treatment at The Clinics.  The corrupt attorneys paid co-conspirator clinic/rehab owners for referring patients and, in turn, the co-conspirator clinic/rehab owners would, at times, pay the corrupt attorneys for referrals.  In some cases, the accident victims would not have a viable bodily injury lawsuit, but the corrupt attorneys, at the direction of defendants **Filenger** and **Rubinstein**, would not relay that information to the accident victims for fear that the accident victims would stop receiving treatment at The Clinics.  The corrupt attorneys, based upon information provided

by Filenger and Rubinstein would, at times, urge the accident victims to continue to receive treatment at the clinics in order for Filenger and Rubinstein to collect the PIP reimbursement.

### Chiropractors and Clinic Staff

15.    The co-conspirator chiropractors, pursuant to instructions from defendants **Filenger** and **Rubinstein**, instructed clinic staff, including other chiropractors, therapists, and medical professionals to engage in conduct designed to increase the potential PIP insurance reimbursement regardless of medical necessity. These instructions included, among others, attempting to convince patients to visit the clinics numerous times and to submit to various treatment modalities, regardless of medical necessity, to falsely inflate pain levels during patient evaluations, and to approve expensive medical tests, including nerve conduction studies, regardless of medical necessity. The co-conspirator chiropractors would falsely answer patients' complaints and inquiries in order to convince such patients to remain at The Clinics and to continue receiving treatment. The co-conspirator chiropractors submitted false and fraudulent documents to the State of Florida and to automobile insurance providers reflecting the ownership of the clinics in nominee names. Co-conspirator chiropractors submitted false and fraudulent documents to insurance providers reflecting that patients had not been solicited. Defendants **Filenger** and **Rubinstein** pressured the personnel who worked at The Clinics to find an EMC for every patient regardless of medical necessity. Defendants **Filenger** and **Rubinstein** retained medical doctors who would make a determination that an EMC existed for each patient, regardless of medical necessity and would not retain doctors who did not make a determination that an EMC existed for each patient.    Co-conspirator magnetic resonance imaging (MRI) owners provided illegal kickbacks to defendants **Filenger** and **Rubinstein** in order to solicit patients.  Co-conspirators

would instruct patients on how to answer questions of insurance providers at Examinations Under Oath (EUOs), in order to conceal the illegal solicitation of such patients.

16.     The co-conspirator chiropractors were required to follow the instructions of defendants **Filenger** and **Rubinstein** in the operation of the clinics/rehab facilities and relevant business issues and decisions including the hiring and firing of employees. The co-conspirator chiropractors directed proceeds derived from the fraud scheme to bank accounts controlled by defendants **Filenger** and **Rubinstein** and issued checks as directed by the defendants. The co-conspirator chiropractors engaged in activities to conceal the true ownership of defendants **Filenger** and **Rubinstein,** including false statements to insurance providers, investigators, inspectors, and law enforcement.

## MANNER AND MEANS OF THE CONSPIRACY

### Use of Nominee Owners

The manner and means by which **Filenger**, **Rubinstein**, and **Spivak** and their co-conspirators sought to accomplish the objective of the conspiracy included the following:

17.     In order to avoid the licensing requirements of the Florida Agency for Health Care Administration, defendants **Filenger** and **Rubinstein** solicited licensed chiropractic physicians, including defendant **Olga Spivak** and Co-conspirators 1, 2, 3, and 4, to serve as nominee owners of The Clinics while defendants **Filenger** and **Rubinstein** maintained complete control of The Clinics.

18.     The nominee owners would receive a salary or a fee for holding themselves out as the owner of one of The Clinics, but would share in little, if any, of the profits of the business.

19.     Defendants **Filenger** and **Rubinstein** gave check-signing authority on the bank accounts to co-conspirator nominees and directed the co-conspirator nominees regarding the

16

negotiation of checks and other financial matters. Defendants **Filenger** and **Rubinstein** would, at times, forge the names of the authorized check signer.

20.     Defendants **Filenger** and **Rubinstein** commingled funds between The Clinics, even though there were different nominee owners of those clinics.

21.     Defendants **Filenger** and **Rubinstein** would establish various corporate entities, such as management and staff companies, in order to launder and conceal the receipt of criminal proceeds.

### Required Protocols

22.     Defendants **Filenger** and **Rubinstein** directed co-conspirator chiropractors, including defendant **Spivak** and Co-conspirator 1, to treat each patient for 10 days within the first two weeks after the auto accident, regardless of medical necessity in order to increase the billing for PIP reimbursement.

23.     The patient files of one or more of The Clinics routinely contained a form that listed the level of pain that the patient purportedly felt at the time of the visit.  The pain levels went from "0," signifying no pain, to "10," signifying that the patient was in excruciating pain.

24.     In order to ensure that the insurance companies would pay the PIP claims and enhance the value of potential lawsuits, defendants **Filenger** and **Rubinstein** instructed co-conspirators, including defendant **Spivak** and Co-conspirator 1, to follow a protocol by recording the patient's pain level as 7 or 8, and sometimes 9 (from a scale of 1-10) during the initial visits and then gradually decrease the pain level in the patient's file, regardless of whether the patient reported such pain level.

25. Defendant **Spivak** and other co-conspirators would direct chiropractors, therapists, and other medical providers at The Clinics to follow the pain level protocol as set forth by defendants **Filenger** and **Rubinstein**.

26. Defendants **Filenger** and **Rubinstein** would terminate or caused to be terminated any doctor who did not follow their pain level protocol or who questioned the defendants' instructions.

27. The chiropractors would not record that the patient had reported zero pain level, because such information would be detrimental to the attempts to receive the insurance proceeds.

### Emergency Medical Conditions (EMC)

28. Defendants **Filenger** and **Rubinstein** would instruct the staff of The Clinics to make sure that every patient received a determination that the patient had an EMC.

29. Defendants **Filenger** and **Rubinstein** would cause the chiropractors, staff, and others to coach the patients to state that they were in severe pain in order to support the determination that an EMC existed.

30. Defendants **Filenger** and **Rubinstein** would only hire and retain health care professionals who determined that every patient had an EMC.

31. Defendants **Filenger** and **Rubinstein** would solicit corrupt medical physicians to ensure that each patient was determined to have an EMC.

32. Defendants Filenger and Rubinstein would instruct clinic staff to schedule as many patients as possible to be present at the clinic on a single day to be examined by a corrupt medical physician.

33. The corrupt medical physician would visit the clinics and perform cursory and inadequate examinations of the patients, usually lasting only several minutes, and thereafter issue

18

EMC certificates for virtually all of the patients in order to insure the ability to bill for services up to the $10,000 PIP limit.

### Illegal Solicitations

34.     With the knowledge and consent of defendants **Filenger** and **Rubinstein**, co-conspirators, including runners, unlawfully solicited auto accident victims to come to The Clinics. The solicitations were made through corrupt tow truck drivers, emergency medical technicians (EMT's), ambulance attendants, hospital personnel, police department employees, collision repair personnel and others.

35.     Defendants **Filenger** and **Rubinstein** caused co-conspirators, including defendant **Spivak** and Co-conspirator 1, to sign the Florida Office of Insurance Regulation Standard Disclosure and Acknowledgement Form in each patient file falsely stating that they were not aware that the patient had been solicited to receive services from the clinics.

### Illegal Kickback Payments

36.     Defendants **Filenger** and **Rubinstein** would pay illegal kickbacks to runners either in cash or by check and to companies incorporated by the runners to conceal the true source and purpose of the payments and to make it appear as if the payments were for legitimate marketing and advertising services.

37.     Defendants **Filenger** and **Rubinstein** set "rules" with their co-conspirator runners, tow truck drivers, chiropractors, corrupt attorneys and corrupt clinic owners regarding how many visits the patient must make to The Clinics before the runners, tow truck drivers, chiropractors, and lawyers were entitled to illegal kickback payments.

38.     Defendants **Filenger** and **Rubinstein** paid kickbacks totaling over a million dollars to runners, tow truck drivers, chiropractors, corrupt attorneys and corrupt clinic owners for the illegal solicitation of patients.

39.     Defendants **Filenger** and **Rubinstein** received an illegal kickback of $300 for every patient the defendants referred to a co-conspirator's MRI facility (hereinafter referred to as the "MRI Facility").

40.     At times, defendants **Filenger** and **Rubinstein** instructed the chiropractors and staff of The Clinics to order MRIs for patients, regardless of medical necessity, and to send those patients to the co-conspirator's MRI Facility.

41.     Defendants **Filenger** and **Rubinstein** referred patients to other corrupt clinic owners and chiropractors and solicited and received kickbacks for those referrals.

42.     Defendants **Filenger** and **Rubinstein** and other co-conspirators maintained an accounting of the patients traded among and between the co-conspirators and the financial implications thereof.

### Staged Accidents

43.     At Metro Chiropractic, defendants **Filenger** and **Rubinstein** caused insurance companies to be defrauded by persons who engaged in staged accidents, that is, auto accidents in which all parties participated in a planned accident in order to fraudulently obtain insurance proceeds.

44.     The co-conspirators paid approximately $1,500 to persons who went to Metro Chiropractic for treatment after the staged accidents, provided they went to Metro Chiropractic for 15 treatments. Such staged accidents were thereafter discontinued because the conduct caused too much scrutiny by insurance providers and law enforcement authorities.

### Form 6b

45.     Defendants **Filenger** and **Rubinstein** caused both defendant **Spivak** and Co-conspirator 1 to sign and mail by United States mail numerous Form 6b's falsely stating that defendant **Spivak** and Co-conspirator 1 were the sole owners of one of The Clinics.

### Unnecessary Services

46.     Defendants **Filenger** and **Rubinstein** ordered coconspirators to conduct expensive diagnostic tests for patients, including nerve conduction velocity tests (NCV's) and electromylograms, regardless of medical necessity.

47.     Defendants **Filenger** and **Rubinstein** directed the chiropractors and the staff to provide to each patient medical equipment that was billed to the insurance providers, which equipment was either not medically necessary or not yet determined to be necessary.

### Other Conduct in Furtherance of the Conspiracy

48.     Defendants **Filenger** and **Rubinstein** would either terminate employees who questioned their illegal practices, such as the illegal solicitation of patients, or instruct them to comply with The Clinic protocol.

49.     Defendants **Filenger** and **Rubinstein,** along with co-conspirator chiropractors and clinic staff, would inform the patients that they would waive the required deductible or co-payments in order to induce the patients to be treated at The Clinics.

50.     Defendants **Filenger** and **Rubinstein** would direct the chiropractors and staff to coach patients to make untruthful statements during Examinations Under Oath conducted by automobile insurance companies.

51.     Defendants **Filenger** and **Rubinstein** requested that a co-conspirator attempt to confirm from a law enforcement source whether individuals were providing information to law enforcement regarding the criminal activities of the Enterprise.

52.     Pursuant to instructions from defendants **Filenger** and **Rubinstein**, co-conspirators submitted claims by United States mail to the insurance companies, but did not collect the required co-payments and deductibles from the patients.

53.     From in or about 2010 through the present, the defendants and co-conspirators, through false and fraudulent representations and corrupt practices, obtained tens of millions of dollars in PIP reimbursement from the Insurance Companies.

### Use of Illegal Funds

54.     Upon receiving the reimbursements from the automobile insurance companies via the United States Mail, defendants **Filenger** and **Rubinstein** and co-conspirators, deposited and cause to be deposited millions of dollars in insurance reimbursement checks into the bank accounts controlled by defendants **Filenger** and **Rubinstein.**   They then converted hundreds of thousands of dollars of proceeds into cash in a variety of ways.   Defendants **Filenger** and **Rubinstein** used the cash, along with checks, to pay corrupt co-conspirator attorneys and chiropractors, clinic staff, tow truck drivers, runners, and others in order to promote and carry on their ongoing criminal activity and conceal and disguise the illegal proceeds from law enforcement.

All in violation of Title 18, United States Code, Section 1962(d).

### COUNT TWO

### Conspiracy to Commit Mail Fraud, Wire Fraud, and Health Care Fraud
### (18 U.S.C. § 1349)

1.     The allegations set forth in the General Allegations Section are hereby re-alleged and expressly incorporated as if set forth herein.

22

2.      The Manner and Means of the Conspiracy Section set forth in Count One of this Indictment are hereby re-alleged and expressly incorporated as if set forth herein.

3.      Beginning at least in or about 2010 and continuing through the present, in Broward, Miami-Dade, and Palm Beach counties, in the Southern District of Florida and elsewhere, defendants,

**FELIX FILENGER**,
**ANDREW RUBINSTEIN, and**
**OLGA SPIVAK,**

knowingly and willfully combined, conspired, confederated, and agreed with each other and with others known and unknown to the Grand Jury to commit an offense against the United States, that is,

a.      to devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing, and attempting to execute, such scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to knowingly cause to be delivered by United States mail and by commercial interstate carrier according to the directions thereon, certain matters and things, in violation of Title 18, United States Code, Section 1341 (Mail Fraud);

b.      to devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign

commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343 (Wire Fraud); and

      c.    to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347 (Health Care Fraud).

## PURPOSE AND OBJECTIVE OF THE CONSPIRACY

      4.    It was the purpose and objective of the conspiracy that the defendants and their co-conspirators would unlawfully enrich themselves by defrauding automobile insurance providers by obtaining the maximum amount of PIP funds through the establishment and operation of chiropractic clinics/rehab facilities, through the use of nominees, the illegal solicitation of patients, the fraudulent submission of documents reflecting facility ownership, billing for unnecessary and/or inflated treatment modalities, and the misrepresentation of patient injury and pain levels.

      All in violation of Title 18, United States Code, Section 1349.

## COUNT THREE

### (Conspiracy to Launder Monetary Instruments)
### (18 U.S.C. § 1956(h))

      1.    The allegations set forth in the General Allegations Section are hereby re-alleged and expressly incorporated as if set forth herein.

      2.    The Manner and Means of the Conspiracy Section set forth in Count One of this Indictment are hereby re-alleged and expressly incorporated as if set forth herein.

      3.    Beginning at least in or about 2010 and continuing through the present, in Broward,

24

Miami-Dade, and Palm Beach counties, in the Southern District of Florida and elsewhere, defendants,

**FELIX FILENGER,**
**ANDREW RUBINSTEIN, and**
**OLGA SPIVAK,**

did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1957, to wit: to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000 such property having been derived from a specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

4.       It is further alleged that the specified unlawful activity is mail fraud, wire fraud, and health care fraud, in violation of Title 18, United States Code, Sections 1341, 1343, and 1347.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT FOUR

(False Statements Relating to Health Care Matters)
**(18 U.S.C. § 1035(a)(2))**

1.       The allegations set forth in the General Allegations Section are hereby re-alleged and expressly incorporated as if set forth herein.

2.       The Manner and Means of the Conspiracy Section set forth in Count One of this Indictment are hereby re-alleged and expressly incorporated as if set forth herein.

3.       On or about June 14, 2013, in Miami-Dade County, in the Southern District of Florida, and elsewhere, defendants,

**FELIX FILENGER,**
**ANDREW RUBINSTEIN, and**
**OLGA SPIVAK,**

in a matter involving a health care benefit program, knowingly and willfully made and caused to be made any materially false, fictitious, and fraudulent statements and representations, and made and used any materially false writing and document knowing the same to contain any materially false, fictitious, and fraudulent statement and entry, that is, executing a Form 6b certifying that defendant **Spivak** was the 100% owner of Accumed Wellness, in connection with the payment for health care benefits, items, and services involving State Farm Florida Insurance Company, a health care benefit program as defined in 18 U.S.C. § 24(b).

All in violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

### COUNT FIVE

(False Statements Relating to Health Care Matters)
**(18 U.S.C. § 1035(a)(2))**

1.      The allegations set forth in the General Allegations Section are hereby re-alleged and expressly incorporated as if set forth herein.

2.      The Manner and Means of the Conspiracy Section set forth in Count One of this Indictment are hereby re-alleged and expressly incorporated as if set forth herein.

3.      On or about June 14, 2013, in Palm Beach County, in the Southern District of Florida, and elsewhere, defendants,

**FELIX FILENGER**,
**ANDREW RUBINSTEIN**, and
**OLGA SPIVAK,**

in a matter involving a health care benefit program, knowingly and willfully made and caused to be made any materially false, fictitious, and fraudulent statements and representations, and made and used any materially false writing and document knowing the same to contain any materially false, fictitious, and fraudulent statement and entry, that is, executing a Form 6b certifying that defendant **Spivak** was the 100% owner of Medwell Wellness, in connection with the payment for

26

health care benefits, items, and services involving State Farm Florida Insurance Company, a health care benefit program as defined in 18 U.S.C. § 24(b).

All in violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

### COUNT SIX

(False Statements Relating to Health Care Matters)
**(18 U.S.C. § 1035(a)(2))**

1.      The allegations set forth in the General Allegations Section are hereby re-alleged and expressly incorporated as if set forth herein.

2.      The Manner and Means of the Conspiracy Section set forth in Count One of this Indictment are hereby re-alleged and expressly incorporated as if set forth herein.

3.      On or about February 25, 2014, in Broward County, in the Southern District of Florida, and elsewhere, defendants,

**FELIX FILENGER and**
**ANDREW RUBINSTEIN**,

in a matter involving a health care benefit program, knowingly and willfully made and caused to be made any materially false, fictitious, and fraudulent statements and representations, and made and used any materially false writing and document knowing the same to contain any materially false, fictitious, and fraudulent statement and entry, that is, executing a Form 6b certifying that Co-conspirator 1 was the 100% owner of Advance, in connection with the payment for health care benefits, items, and services involving State Farm Florida Insurance Company, a health care benefit program as defined in 18 U.S.C. § 24(b).

All in violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

## COUNT SEVEN

(False Statements Relating to Health Care Matters)
**(18 U.S.C. § 1035(a)(2))**

1.       The allegations set forth in the General Allegations Section are hereby re-alleged and expressly incorporated as if set forth herein.

2.       The Manner and Means of the Conspiracy Section set forth in Count One of this Indictment are hereby re-alleged and expressly incorporated as if set forth herein.

3.       On or about February 25, 2014, in Broward County, in the Southern District of Florida, and elsewhere, defendants,

**FELIX FILENGER and
ANDREW RUBINSTEIN**,

in a matter involving a health care benefit program, knowingly and willfully made and caused to be made any materially false, fictitious, and fraudulent statements and representations, and made and used any materially false writing and document knowing the same to contain any materially false, fictitious, and fraudulent statement and entry, that is, executing a Form 6b certifying that Co-conspirator 1 was the 100% owner of Advance, in connection with the payment for health care benefits, items, and services involving State Farm Florida Insurance Company, a health care benefit program as defined in 18 U.S.C. § 24(b).

All in violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

### FORFEITURE ALLEGATION #1
(Conspiracy to Commit Racketeering Activity)

1.       Upon conviction of a violation of Title 18, United States Code, Section 1962(d), as set forth in Count One of this Indictment, the defendants, **FELIX FILENGER, ANDREW RUBINSTEIN**, and **OLGA SPIVAK,** shall forfeit to the United States pursuant to Title 18, United States Code, Section 1963:

28

(a)  Any interest acquired or maintained in violation of Title 18, United States Code, Section 1962;

(b) Any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, the Enterprise described in the Indictment which was established, operated, controlled and conducted or participated in the conduct in violation of Title 18, United States Code, Section 1962; and

(c) Any property constituting, or derived from, proceeds obtained directly and indirectly from racketeering activity in violation of Title 18, United States Code, Section 1962.

2.    The specific property to be forfeited includes, but is not limited to:

A.    A money judgment in the amount of $23,000,000 which represents the amount of proceeds involved, or traceable to the violation alleged in Count One of this Indictment.

## FORFEITURE ALLEGATION #2
### (Conspiracy to Commit Mail Fraud, Wire Fraud, and Health Care Fraud)

1.    Upon conviction of a violation of Title 18, United States Code, Section 1349, as set forth in Count Two of this Indictment, the defendants, **FELIX FILENGER, ANDREW RUBINSTEIN**, and **OLGA SPIVAK,** shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense. The property to be forfeited includes, but is not limited to the following property:

A.    A money judgment in the amount of $23,000,000 which represents the amount of proceeds involved, or traceable to the violation alleged in Count Two of this Indictment.

## FORFEITURE ALLEGATION #3
### (Conspiracy to Launder Monetary Instruments)

1.    Upon conviction of a violation of Title 18, United States Code, Section 1956(h), as set forth in Count Three of this Indictment, the defendants, **FELIX FILENGER, ANDREW RUBINSTEIN**, and **OLGA SPIVAK,** shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in the offense, and

29

any property traceable to such property. The specific property to be forfeited includes, but is not limited to, the following:

A. The sum of $23,000,000, which represents the amount of proceeds involved in, or traceable to the violation alleged in Count Three of this Indictment.

A TRUE BILL

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

JEFFREY N. KAPLAN
ASSISTANT UNITED STATES ATTORNEY

PAUL SCHWARTZ
ASSISTANT UNITED STATES ATTORNEY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA                    CASE NO. _____

vs.

FELIX FILENGER, et al                       **CERTIFICATE OF TRIAL ATTORNEY***

_____ Defendants. /       **Superseding Case Information:**

**Court Division**: (Select One)            New Defendant(s)        _____
                                            Number of New Defendants
    Miami _____ Key West _____   Total number of counts   _____
    FTL ___X___ WPB _____ FTP _____

I do hereby certify that:

1.    I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.    I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.    Interpreter:    (Yes or No)    No
    List language and/or dialect    English

4.    This case will take__20__ days for the parties to try.

5.    Please check appropriate category and type of offense listed below:
    (Check only one)                  (Check only one)

| | | | | |
|---|---|---|---|---|
| I | 0 to 5 days | _____ | Petty | _____ |
| II | 6 to 10 days | | Minor | _____ |
| III | 11 to 20 days | X | Misdem. | _____ |
| IV | 21 to 60 days | _____ | Felony | X |
| V | 61 days and over | | | |

6.    Has this case been previously filed in this District Court? (Yes or No)    No
If yes:
Judge: _____    Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?    (Yes or No) No
If yes:    Magistrate Case No.
Related Miscellaneous numbers:    **15-6189-Hunt; 15-6190-Hunt; 14-WT-60001-WPD; 14-WT-60002-WPD;**
    **14-6112-Hunt; 14-6351-Seltzer**
Defendant(s) in federal custody as of
Defendant(s) in state custody as of
Rule 20 from the District of

Is this a potential death penalty case? (Yes or No)    _____Yes    ___X___ No

7.    Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?_____ Yes    No    X

8.    Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?    _____ Yes    No    X

_____
Jeffrey N. Kaplan
ASSISTANT UNITED STATES ATTORNEY
Court ID No. A5500030

*Penalty Sheet(s) attached    REV.9/11/07

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name: FELIX FILENGER**

**Case No**: _____

Count #: 1

RICO Conspiracy

18 U.S.C. § 1962(d)

**\*Max. Penalty:**          20 years imprisonment; $250,000 fine; 3 years' supervised release

Count #: 2

Conspiracy to Commit Mail Fraud, Wire Fraud & Health Care Fraud.

18 U.S.C. § 1349

**\*Max. Penalty:**          20 years imprisonment; $250,000 fine; 3 years' supervised release

Count #: 3

Conspiracy to Launder Monetary Instruments.

18 U.S.C. § 1956(h)

**\*Max. Penalty:**          20 years imprisonment; The greater of $250,000 or not more than twice the
amount of the criminally derived property involved in the transaction; 3 years'
supervised release

Count #: 4-7

False Statements Relating to Health Care Matters

18 U.S.C. § 1035

**\*Max. Penalty:**          5 years imprisonment; $250,000 fine; 3 years' supervised release

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or
forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: **ANDREW RUBINSTEIN, a/k/a Andrei Rubinsteyn**

**Case No**: _____

Count #: 1

RICO Conspiracy

18 U.S.C. § 1962(d)

**\*Max. Penalty:**          20 years imprisonment; $250,000 fine; 3 years' supervised release

Count #: 2

Conspiracy to Commit Mail Fraud, Wire Fraud & Health Care Fraud

18 U.S.C. § 1349

**\*Max. Penalty:**          20 years imprisonment; $250,000 fine; 3 years' supervised release

Count #: 3

Conspiracy to Launder Monetary Instruments

18 U.S.C. § 1956(h)

**\*Max. Penalty:**          20 years imprisonment; The greater of $250,000 or not more than twice the amount of the criminally derived property involved in the transaction; 3 years' supervised release

Count #: 4-7

False Statements Relating to Health Care Matters

18 U.S.C. § 1035

**\*Max. Penalty:**          5 years imprisonment; $250,000 fine; 3 years' supervised release

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: <u>OLGA SPIVAK</u>

**Case No**: _____

Count #: 1

<u>RICO Conspiracy</u>

<u>18 U.S.C. § 1962(d)</u>

**\*Max. Penalty:**          20 years imprisonment; $250,000 fine; 3 years' supervised release

Count #: 2

<u>Conspiracy to Commit Mail Fraud, Wire Fraud & Health Care Fraud</u>

<u>18 U.S.C. § 1349</u>

**\*Max. Penalty:**          20 years imprisonment; $250,000 fine; 3 years' supervised release

Count #: 3

<u>Conspiracy to Launder Monetary Instruments</u>

<u>18 U.S.C. § 1956(h)</u>

**\*Max. Penalty:**          20 years imprisonment; The greater of $250,000 or not more than twice the
amount of the criminally derived property involved in the transaction; 3 years'
supervised release

Count #: 4-5

<u>False Statements Relating to Health Care Matters</u>

<u>18 U.S.C. § 1035</u>

**\*Max. Penalty:**          5 years imprisonment; $250,000 fine; 3 years' supervised release

\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or
forfeitures that may be applicable.